IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. NANCY DAENA PRECIADO-MUNOZ, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIV-22-899-G |
| 1. AMERICAN FIDELITY ASSURANCE CO., | ) ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | **ATTORNEYS LIEN CLAIMED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Nancy Daena Preciado-Munoz, and for her Complaint against the Defendant, alleges and states as follows:

## PARTIES

1. Plaintiff, Nancy Daena Preciado-Munoz, is an adult female resident of Oklahoma County, Oklahoma.

2. Defendant is American Fidelity Assurance Co. ("AFAC"), a corporation doing business in and around Oklahoma County, Oklahoma.

## JURISDICTION AND VENUE

3. This is a cause of action arising out of Plaintiff's former employment with Defendant and is based on the following claims: (a) disability discrimination and retaliation for having requested reasonable accommodations in violation of the Americans with Disabilities Act ("ADA") and ADA Amendments Act ("ADAAA"); (b) violations of the

Family Medical Leave Act ("FMLA"); (c) pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Pregnancy Discrimination Act of 1978; (d) gender discrimination, sexual harassment, the creation of a sexually hostile work environment and retaliation for complaining of the same in violation of Title VII; (e) race discrimination and retaliation in violation of 42 U.S.C. § 1981; and (f) race discrimination and retaliation for having engaged in protected opposition to race discrimination in violation of Title VII of the Civil Rights Act of 1964.

4. Jurisdiction over Plaintiff's federal causes of action is vested in this Court under 28 U.S.C. § 1331.

5. To the extent required, Plaintiff has exhausted her administrative remedies as to the above-listed claims by timely filing an EEOC Charge of Discrimination on or about August 12, 2021. Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated July 22, 2022, which Plaintiff received thereafter. And, Plaintiff has timely filed this action within ninety (90) days of receipt of her notice of right to sue.

6. All acts complained of herein occurred in or around Oklahoma County, Oklahoma. Oklahoma County is located within the Western District of the United States District Court of Oklahoma. Thus, venue is proper in this Court under 28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

7. Plaintiff, who is a Hispanic female, was employed with AFAC for seven (7) years, from in or around April 28, 2014, until on or about April 30, 2021.

8. On or about April 28, 2014, she was hired as an Analyst, Field Compensation Liaison by Jessica Sanders, Strategy Director. During her employment, she also held the positions of Supervisor/Agent Compensation and Sales Incentive Compensation Manager.

9. Throughout her employment, Plaintiff was an outstanding employee. She received positive performance reviews, promotions, and merit pay increases. At no time was she written up.

10. In or around November 2019, Plaintiff was introduced to Ashlee Kemper, Assistant Vice President of Accounts Payable and Operations in the Financial Management Services Division.

11. Over the course of the next few weeks, Kemper consistently expressed her "pull" with Dan Maloney, Vice President/Controller, who was the manager over Plaintiff. Kemper commented that if Plaintiff stuck with her, Plaintiff would be "more than great."

12. In or around early 2020, Plaintiff began being subjected to sexual harassment and a sexually hostile work environment by Kemper.

13. While at work, Kemper invited Plaintiff (who is married) to spend the night at Kemper's house, along with Plaintiff's 2-year-old daughter. However, Plaintiff declined.

14. Kemper also purchased unsolicited gifts for Plaintiff's 2-year old daughter and brought them to work. Plaintiff also has a son who was oddly excluded from the invitation and gifts.

15. The invitation and gifts were unwelcome and made Plaintiff uncomfortable.

3

16. On or about January 18-19, 2020, Kemper inappropriately texted Plaintiff questions about Plaintiff's sexual encounters, while also telling Plaintiff of her sexually inappropriate encounters of Kemper's past.

17. On or about January 22, 2020, Kemper continued to make the inappropriate comments and also sent Plaintiff a semi-nude photo of herself, making Plaintiff increasingly uncomfortable.

18. Kemper's comments included but were not limited to, "you have nice lips," and "I think Latino girls are cute"

19. Such severe and pervasive comments and ever-increasing overtures were unwelcome and offensive to Plaintiff, creating an intimidating, hostile and offensive work environment.

20. On or about February 14, 2020, embarrassed to discuss Kemper's inappropriate behavior, Plaintiff sought guidance from HR Specialist, Leah Babbitt (who Plaintiff also considered a friend).

21. A few days later, Babbitt advised Plaintiff that an official report needed to be made, either by Plaintiff or Babbitt.

22. On or about February 17, 2020, Plaintiff reported the sexual harassment/ sexually hostile work environment and her concerns about working with Kemper to Jerry McCrae, VP and Director of Human Resources.

23. In that same context, Plaintiff reported that Kemper said: "If you stick with me,

I'll move you up and you can have the department under me." Plaintiff understood this to mean that if she were close with Kemper, Kemper, in exchange, would promote Plaintiff (on a *quid pro quo* basis).

24. McCrae laughingly responded, "that's just Ashlee."

25. Thayla Bohn, Senior Vice President Corporate and Human Resources, was also informed and made aware of Kemper's actions by McRae and/or Babbitt. Yet, no remedial action was taken.

26. Prior to her complaint about Kemper on or about February 17, 2020, Plaintiff had applied for a promotion to Supervisor/Agent Compensation (in or around January 2020).

27. Plaintiff was excited for the opportunity, but also hesitant as she was concerned the new position would require her to work within close proximity to Kemper, attend meetings together, and share the same manager and bathroom area.

28. Plaintiff told HR VP McCrae of her concerns and asked about an update on the status of her sexual harassment complaint. However, she did not receive any response.

29. On or about March 23, 2020, Vice President/Controller Maloney told Plaintiff she was being promoted to Supervisor/Agent Compensation. However, the announcement was not made to her team until on or about April 1, 2020.

30. In the interim, in or around April 2020, Plaintiff received an outstanding performance review from Maloney.

31. Thereafter, in the months that followed throughout the Summer and Fall of

2020, Plaintiff and her team were stretched extremely thin as there had been a substantial increase in their workload and some of her team had left their employment with AFAC.

32. Despite this, President Jeanette Rice, Bohn and McCrae would not allow Plaintiff to post or hire to fill vacant positions, forcing her to perform the work of three (3) positions: manager, supervisor and senior analyst.

33. She was also often required to work eighty (80) to ninety (90) hours per week.

34. Beginning on or about August 5, 2020, Plaintiff began treatment for medical issues related to her hip and back. She began seeing a Chiropractor who determined her hip and back condition stemmed from the extensive amount of time she was required to sit and work (i.e., about 80-90 hours per week).

35. She underwent treatment about twice per week for about one month and then about once per week the following month (September 2020).

36. Plaintiff informed CFO John Cassil of her medical condition and the treatment she was receiving.

37. She also asked Cassil for accommodations in the form of being allowed to stay in a work area with an ergonomic desk and lumbar-support chair.

38. Then, on or about September 30, 2020, Plaintiff suffered a panic attack and migraine while driving home from work.

39. The next day, on or about October 1, 2020, Plaintiff sought medical treatment and was diagnosed with insomnia, an anxiety disorder, depression and migraines (in addition

to her back and hip condition).

40. Plaintiff talked to Cassil about her diagnoses, as well as her need for time off for treatment.

41. Based on her medical conditions, Plaintiff is/was a qualified individual with a disability, in that, she suffers/suffered from impairments that substantially limit/limited her ability to perform one or more major life activities, including, but not limited to her ability to sit, lift, bend, stand, sleep, eat, think, see, concentrate, perform certain physical tasks, and/or care for herself and her family. Her conditions also impacted her internal bodily processes, including but not limited to her neurological, cognitive, musculoskeletal and vision systems.

42. Plaintiff also had a record of such disabilities and/or was regarded as having such disabilities.

43. At all relevant times though, she was able to perform the essential functions of her job with or without reasonable accommodations.

44. Plaintiff applied for intermittent FMLA leave for self-care due to her anxiety and depression (as well as her hip and back condition) in or around November/December 2020.

45. Around this same time (October 2020), Plaintiff also applied for intermittent FMLA leave to care for her father who had been recently diagnosed with very advanced terminal cancer. However, Plaintiff limited her FMLA leave usage, as she had to make up

the time she missed upon her return to ensure all tasks and deadlines were complete.

46. During this time, Plaintiff repeatedly voiced her concerns that she was not being paid in accordance with the job duties with which she was tasked, that she was working extensive hours, that she was not allowed to fill job vacancies, and that she was not allowed to participate in meetings about staffing needs.

47. Indeed, in or around Fall/Winter 2020, Plaintiff spoke with President Jeanette Rice about the staffing needs and that she was required to fulfill the responsibilities for multiple positions and needed support, but was being given none.

48. Rather than addressing the issue directly, Rice suggested Plaintiff consult a mentor.

49. Therefore, Plaintiff spoke with Faith Grant, who worked in Sales Operations. Plaintiff told Grant she felt her hands were tied, that she is a Hispanic female, who complained she was harassed and was not getting support to perform the duties in her department.

50. Grant said she felt obligated to report Plaintiff's concerns to HR as a potential threat of litigation.

51. Despite this, HR failed to take any action.

52. Therefore, in or around January 2021, Plaintiff reached a near breaking point and lodged a complaint with her then-immediate supervisor, CFO Cassil.

53. She complained that she, as the only Hispanic female in the Financial

Management Services Division, was subject to intolerable work conditions, in that she was performing the work of a Manager, but only paid as a Supervisor. And, Plaintiff was the only employee who was responsible for overseeing a department that was designated as a Supervisor. All others responsible for overseeing a department (all of whom were White) were Managers.

54. Plaintiff also complained that she had not been permitted to fill vacant positions, leaving her to complete the work not done as a result of the open positions.

55. In response, Cassil said he would allow Plaintiff to hire additional staff. Cassil also relayed Plaintiff's complaints to McCrae.

56. As a result of Cassil's (a White male) report to McCrae, in or around mid-January 2021, McCrae had a meeting with Plaintiff. McCrae began the meeting by asking Plaintiff whether certain conversations or actions had taken place in response to her sexual harassment complaint. Plaintiff told him they had not and that no follow up or actions were taken. Instead, she, alone, managed to limit her interactions with Kemper, working together with others to perform her job.

57. Plaintiff complained to McCrae about HR's lackluster response to her complaints. In fact, it took a White male to report the situation before a meeting was held.

58. She voiced that her sexual harassment complaint had been made nearly a year before. And, she had been asking for support in her department for over six months with no response.

59. Despite her complaints, still no action was taken. Rather, McCrae expressed contentment with the fact that Plaintiff (despite the lack of response from HR) managed to work together with others to perform her job while avoiding contact with Kemper, to the extent possible.

60. On or about January 29, 2021, after having long performed the Sales Incentive Compensation Manager job responsibilities, Cassil gave Plaintiff the title. At that time, the Supervisor position was allegedly eliminated.

61. On or about March 8, 2021, Plaintiff notified Cassil that she was pregnant and that she would need time off due to her pregnancy being high-risk. Particularly, she was scheduled for 2-3 doctor's appointments every week. However, she was not told of her right to FMLA in connection with her pregnancy.

62. Cassil informed Maloney and Merlyn Frederick, Assistant Vice President/Assistant Controller, of Plaintiff's pregnancy and time off related thereto.

63. On or about March 22, 2021, AFAC hired a temporary contract compensation consultant, Krishna Mulani, to work under Plaintiff as the "supervisor" on a six (6) month contract. The new supervisor was to assist Plaintiff and perform her duties while she was on maternity leave (which would have begun in or around September, 2021).

64. Plaintiff had to train the consultant. Plaintiff also created written processes so that her job duties could be performed in her absence.

65. Then, on or about Monday, April 26, 2021, Plaintiff was called by Cassil and

Kimberly Brecheen, in HR, and told that she was being placed on administrative leave effective immediately.

66. Plaintiff was on administrative leave until Friday, April 30, 2021. No further contact was had with AFAC. Plaintiff's employment with AFAC was terminated on that date (April 30, 2021). Cassil and Brecheen told Plaintiff that senior leadership decided her Manager position was no longer needed and they were going in a different direction.

67. AFAC informed the EEOC in its Position Statement that in April 2021, senior leadership determined that staffing needs in Plaintiff's department were being reduced due to the implementation of a new technology-based compensation system (compared to the manual based system) that rendered the "Manager" role unnecessary.

68. Defendant AFAC further claimed in its position statement that there was no position to which to move Plaintiff. Significantly, however, the "supervisor" position was not eliminated, and Plaintiff could have returned to her previous role (that was being performed by a contract "consultant").

69. Plaintiff had also been told the year before, in or around late-March 2020, that her position (then titled as a "supervisor") was not being eliminated. That is, Maloney told Plaintiff there was a new operational system being implemented that would result in downsizing the department she oversaw. Maloney explained that in order to retain staff until the new system was implemented, employees were being paid retention bonuses. However, Maloney said that because Plaintiff's position was not going to be eliminated, she would not

receive a retention bonus.

70. Moreover, as of April 30, 2021, the manual based processes had not been eliminated and staffing in Plaintiff's department had not been reduced due to the new system. In fact, the new technology-based compensation system was not built yet, nor was it implemented. The project was still in the development phase, being built, validated, reviewed and had not yet been tested.

71. In addition, Plaintiff's Manager position had only been made effective at the end of January 2021. The consultant was retained on or about March 22, 2021. Four (4) new analysts were hired on or about March 29, 2021 - two were permanent positions and two were temporary. A contract-based database analyst was retained on or about April 12, 2021.

72. As such, the proffered reason for termination was pretext for an underlying motive to discriminate and retaliate against Plaintiff.

73. Moreover, after Plaintiff was terminated, Plaintiff learned Ashlee Kemper (who Plaintiff reported for having sexually harassed her) began performing the duties Plaintiff performed prior to her termination. Plaintiff also learned that a second consultant was contracted to support the department, and eventually a permanent "Commissions Supervisor" position was created and filled by a full-time employee.

74. As a direct and proximate result of Defendant's actions, Plaintiff has suffered injuries described hereafter.

## COUNT I: ADA/ADAAA

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

75. The matters alleged above constitute disability discrimination and retaliation for having requested reasonable accommodations in violation of the ADA and ADAAA.

76. More specifically, Plaintiff was a qualified individual with a disability. She suffers from impairments which substantially limited one or more major life activities. Plaintiff's disabilities impact one or more of her internal bodily processes, as shown herein. And, Plaintiff had a record of disability and was regarded as disabled because she had an actual or perceived impairment at the time she was terminated.

77. Despite her impairments, Plaintiff was able to perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

78. Plaintiff was terminated under circumstances giving rise to an inference of discrimination.

79. The matters alleged above also constitute retaliation for having requested reasonable accommodations in violation of the ADA and ADAAA. Plaintiff is entitled to relief because she is a qualified individual with a disability; she engaged in protected activity by requesting reasonable accommodations; she suffered adverse actions subsequent to the protected activity and a causal link exists between the protected activity and the adverse actions.

80. As damages, Plaintiff has suffered lost income, past and future, emotional

distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

81. Because the actions of Defendant were willful, wanton or, at least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT II: FMLA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

82. The matters alleged above constitute interference with and retaliation for Plaintiff's use or attempted use of medical leave in violation of the FMLA.

83. Plaintiff was entitled to medical leave because she worked for Defendant, an entity with more than 50 employees within a 75 mile radius of Plaintiff's work site, for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

84. Defendant interfered with Plaintiff's rights under the FMLA by engaging in acts intended to have a chilling effect on Plaintiff's use of FMLA, discouraging her from taking FMLA leave by putting her in a position so as to require she make up her missed time when she returned.

85. Defendant also retaliated against Plaintiff for her use of FMLA leave by *inter alia* terminating her employment. Defendant's actions were taken in response to Plaintiff's exercise of rights under the FMLA.

86. As a direct and proximate result of Defendant's willful conduct, Plaintiff suffered injuries and is entitled to recover all damages or other equitable relief allowed by law, including, but not limited to, lost wages, past and future, liquidated damages, based on the willfulness of Defendant's violation of the FMLA, attorneys' fees and costs.

### COUNT III: Pregnancy Discrimination Act

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

87. The matters alleged above constitute violations of the Pregnancy Discrimination Act of 1978.

88. Plaintiff is entitled to relief under the pregnancy discrimination act because she was pregnant, she was qualified for her job, she was terminated, and her job duties/job was not eliminated.

89. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages.

90. Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

### COUNT IV: Title VII - Gender

For her fourth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

91. This Count goes against AFAC.

92. The matters alleged above constitute violations of Title VII of the Civil Rights Act of 1964 in the nature of gender discrimination.

93. Plaintiff is entitled to relief under Title VII for gender discrimination because Plaintiff is female; she was qualified for her job; she was terminated; and her job/job duties were not eliminated.

94. Plaintiff is also entitled to relief under Title VII for sexual harassment and the creation of a sexually hostile work environment, as looking at the totality of the circumstances, Plaintiff was subject to conduct of a sexual nature. Moreover, the conduct was unwelcome; and the conduct was sufficiently severe or pervasive to alter the terms, conditions or privileges of her employment.

95. Plaintiff is also entitled to relief under Title VII for retaliation because Plaintiff engaged in protected opposition to gender-based discrimination and sexual harassment; she suffered adverse actions subsequent to the protected activity; and a causal link exists between the protected activity and the adverse actions.

96. As damages, Plaintiff has suffered lost income, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

97. Because the actions of Defendant were willful, wanton or, at least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

### COUNT V:  42 U.S.C. § 1981

For her fifth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

98. The matters alleged above constitute violations of 42 U.S.C. § 1981 in the nature of race discrimination, harassment, the creation of a racially based hostile work environment and retaliation.

99. Plaintiff is entitled to relief for race discrimination because she is Hispanic, she was qualified for her job, she was terminated from her employment, and her job/job duties were not eliminated.

100. Plaintiff is further entitled to relief for retaliation because she engaged in protected opposition to race discrimination; she suffered adverse actions subsequent to the protected activity, and a causal link exists between the protected activity and the adverse actions.

101. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

102. Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## **COUNT VI: Title VII – Race**

For his sixth cause of action, Plaintiff incorporates all prior allegations and further

alleges and states as follows:

103. The matters alleged above constitute violations of Title VII of the Civil Rights Act in the nature of race discrimination, race-based harassment, the creation of a race-based hostile work environment and retaliation.

104. Plaintiff is entitled to relief for race discrimination because she is Hispanic, she was qualified for her job, she was terminated from her employment, and her job/job duties were not eliminated.

105. Plaintiff is entitled to relief for retaliation because she engaged in protected opposition to race discrimination; she suffered adverse actions subsequent to the protected activity, and a causal link exists between the protected activity and the adverse actions.

106. As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

107. Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## **REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other

relief under federal and Oklahoma state law as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 13TH DAY OF OCTOBER, 2022.**

s/ Jana B. Leonard
JANA B. LEONARD, OBA# 17844
SHANNON C. HAUPT, OBA #18922
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800       (telephone)
(405) 239-3801       (facsimile)
leonardjb@leonardlaw.net
haupts@leonardlaw.net
JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED